UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

GARY F. PEASEL,                    )
                                   )
         Plaintiff,                )
                                   )
    vs.                            )    Case No. 4:04CV00823 JCH/AGF
                                   )
JO ANNE B. BARNHART,               )
Commissioner of Social Security,   )
                                   )
         Defendant.                )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before this Court for judicial review of the final decision of the

Commissioner of Social Security denying Gary Peasel's application for disability

insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. § 401, et

seq., and Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C.

§ 1381, et seq. The action was referred to the undersigned United States Magistrate

Judge under 28 U.S.C. § 636(b) for recommended disposition. For the reasons set forth

below, the Court recommends that the decision of the Commissioner be reversed and the

case remanded for further development of the record.

This case has a rather complex procedural history. Plaintiff, who was born on

August 12, 1960, applied for disability insurance benefits and SSI on November 22, 2000,

claiming a disability onset date of June 30, 1999, due to swelling in his legs, loss of

circulation, chronic pain, and poor memory. After his applications were denied initially,

Plaintiff requested a hearing before an Administrative Law Judge (ALJ). A hearing was

held on June 20, 2001, and the ALJ issued a decision on July 27, 2001, finding that

Plaintiff was not disabled as defined by the Act. The Appeals Council of the Social Security Administration denied Plaintiff's request for review, and Plaintiff sought judicial review. On January 3, 2003, the Commissioner filed a motion to remand the case for further development of the record.

Meanwhile, on February 4, 2002, Plaintiff had filed a new application for disability insurance benefits based upon essentially the same impairments asserted in his November 2000 applications. This new application was denied at the initial administrative level on April 12, 2002. Plaintiff requested a hearing, and one was scheduled for January 23, 2003 before another ALJ. The day of the hearing, the Court granted the Commissioner's motion to remand the present case. This was brought to the attention of the ALJ at the start of the January 23, 2003 hearing.[1] On May 15, 2003, the Appeals Council officially remanded the present case to the ALJ in accordance with the Order of the Court. On September 30, 2003, another hearing was held on remand before the same ALJ who had conducted the January 23 hearing.

The ALJ issued two essentially identical decisions on March 23, 2004, finding that Plaintiff was not disabled, one as to Plaintiff's November 2000 applications and one as to Plaintiff's February 2002 application. Plaintiff did not administratively appeal the decision on his February 2002 application. On July 1, 2004, Plaintiff filed this action for

---

[1] In light of the timing, it is possible that what was brought to the ALJ's attention was the undersigned Magistrate Judge's Report and Recommendation dated January 9, 2004, recommending that the Commissioner's motion be granted.

judicial review of the decision on his November 2000 applications.[2]

## ALJ'S SUMMARY OF FINDINGS

The ALJ summarized his March 23, 2004 findings as follows:

1.      Plaintiff met the disability insured status requirements of the SSA on June 30, 1999; his last date of insured status was December 31, 2004.

2.      The record did not specifically confirm that Plaintiff had engaged in substantial gainful activity since at least June 30, 1999.

3.      The medical evidence established that Plaintiff had a history of idiopathic edema with vascular insufficiency, a history of sleep apnea, and a fractured toe. He did not have an impairment or combination of impairments listed in, or medically equal to, the appropriate listings set forth in 20 C.F.R., Part 404, Subpart P, Appendix 1 ("Appendix 1").

4.      The allegations of symptoms or combination of symptoms of such severity as to preclude all types of work activity were not consistent with the evidence as a whole and were not persuasive.

5.      Plaintiff's impairments precluded routinely lifting more than ten pounds and standing and/or walking more than two to four hours in an eight hour workday.

6.      Plaintiff could not perform his past relevant work (as a postal clerk/ sorter).

7.      Plaintiff was a younger individual (43) with more than a high school education.

8.      In view of Plaintiff's age and residual functional capacity (RFC), the issue of transferability of work skills was not material.

---

[2]      The letter accompanying the unfavorable decision as to Plaintiff's November 2000 applications stated that if Plaintiff did not file written objections with the Appeals Council and the Appeals Council did not act on its own motion to review the case, the ALJ's decision would become the final decision of the Commissioner on the 61st day following the date of the decision, and that Plaintiff would have 60 days thereafter to file an action in court for judicial review.

9.      Medical-Vocational Rules 201.27 through 201.29 of Table No. 1 (sedentary work), 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "Guidelines"), established that there were a significant number of other jobs that Plaintiff could perform.

10.     Plaintiff was able to perform other work, available in significant numbers, since June 30, 1999.

11.     Plaintiff was not under a disability as defined under the Social Security Act at any time through the date of the ALJ's decision.

Supp. Tr. at 12-13.

Plaintiff argues that the ALJ committed reversible error in discounting the opinion of Plaintiff's treating physician, Richard Di Valerio, M.D., and as a result, arrived at an RFC that was not based upon any medical evidence. Plaintiff further argues that the ALJ erred in failing to consider Plaintiff's subjective complaints of pain under the proper standards; in failing properly to develop the record upon remand from the Appeals Council; and in relying on the Guidelines rather than obtaining the testimony of a vocational expert.

## BACKGROUND

### Work History

Plaintiff worked as a postal clerk and sorter for the Post Office from 1979 to 1999. From 1993 through 1997 he earned between $52,000 and $63,000 per year. During 1998 and 1999 he earned approximately $25,000 per year. From 1997 onwards, Plaintiff was also self-employed as the owner/operator of a small business selling phone cards. The record is unclear as to his earnings from this venture. Tr. at 75, 94.

### Medical Record

The earliest medical evidence in the record is an MRI report of Plaintiff's

lumbar spine, dated July 28, 1999.  The MRI revealed a small right posterior lateral soft tissue disc protrusion at L5-S1 abutting the right S1 nerve root.  It was noted that Plaintiff had a history of lower extremity pain and weakness.  Tr. at 111.  Diagnostic radiology reports dated August 8, 1999, of Plaintiff's left foot and left ankle noted minimal degenerative change at the first metacarpophalangeal joint and soft tissue swelling.  No bony abnormality, fracture, or destructive process was detected.  Tr. at 109-10.

On August 13, 1999, Dr. Di Valerio, an internist, examined Plaintiff for evaluation and treatment of Plaintiff's swelling and pain in his left foot and ankle.  Dr. Di Valerio noted that Plaintiff's symptoms began without obvious injury or provocation in June 1999, and that Plaintiff had used Aleve and Advil sporadically for the problem without benefit.  On examination, Dr. Di Valerio noted that Plaintiff's left foot and ankle were diffusely swollen and tender without erythema (redness and inflamation of the skin) or warmth.  Dr. Di Valerio noted  Plaintiff's history of psoriasis and diagnosed psoriatic arthritis.  Plaintiff was started on a Medrol Dosepak (a steroidal anti-inflammatory drug), and Relafen (a nonsteroidal anti-inflammatory drug).  Tr. at 116-17.

Dr. Di Valerio's treatment notes from August 20, 1999, state that Plaintiff was not doing well, and that he was switched from Relafen to Celebrex (a nonsteroidal anti-inflammatory drug).  Tr. at 376.  Dr. Di Valerio reported that at a follow-up visit on September 3, 1999, Plaintiff continued to have a lot of swelling of his left foot and ankle, particularly over the dorsal aspect.  Colchicine (a drug used to treat gouty arthritis) was added to the Celebrex.  Dr. Di Valerio next saw Plaintiff on October 11, 1999.  Plaintiff showed no response at all to any of the treatments and was started on Prednisone (a

steroidal anti-inflammatory drug).  On November 3, 1999, Plaintiff continued to show dorsal swelling over his left foot.  A three-view examination of Plaintiff's left foot and left ankle demonstrated no evidence of bony abnormality nor significant arthritic change.  Tr. at 118, 123.[3]

A left leg venogram[4] dated November 16, 1999, showed no evidence of deep venous thrombosis, but did suggest a lack of normal valvular structures, a condition which might predispose Plaintiff to deep venostasis[5] and chronic stasis.  It was noted that Plaintiff had a previous negative Doppler[6] of the left lower extremity.  Tr. at 107-08.  Dr. Di Valerio's treatment notes from December 8, 1999, state that the swelling in Plaintiff's feet persisted, with the left foot being worse than the right, and that a venogram showed "an apparent abnormal venous system" in Plaintiff's legs.  Plaintiff was prescribed Lasix (a diuretic) and K-dur (a potassium supplement used to replace potassium loss which may result from taking a diuretic).  In addition, a vascular surgery consult was planned.  Tr. at

---

[3]   The actual notes from the August, September, October, and November visits are not in the record; they are summarized in a letter dated February 2, 2001, to Plaintiff's attorney from Dr. Di Valerio reviewing his treatment notes.

[4]   A venogram is a catheter-based test in which a dye is injected into a vein prior to an X ray.  The die shows on the X ray, allowing a physician to see the shape, size, and configuration of the vein, including any possible obstructions.  www.heartcenteronline.com

[5]   Venostasis (venous stasis) refers to the slowing of blood flow through the leg veins on its return to the heart.  Venostasis is caused by defective valves in the veins.  Because these valves cannot close tightly, blood pools in the veins, resulting in swelling.  A defective valve can be congenital or caused by inflammation and clotting of a vein.  www.mayoclinic.com

[6]   A medical Doppler study is a noninvasive test that can be used to evaluate blood flow and pressure by bouncing high-frequency sound waves off red blood cells.  Id.

128. In the previously noted letter dated February 2, 2001, to Plaintiff's attorney, Dr. Di Valerio stated that Plaintiff was sent to a vascular surgeon who felt that he had venous stasis. Tr. at 123. The surgeon's actual report is not in the record.

Dr. Di Valerio's treatment notes from February 14, 2000, state that the swelling in Plaintiff's feet and ankles remained "bad," and that Plaintiff complained of pain in his extremities from prolonged standing and expressed concerns about his ability to work. The notes indicate 3+ swelling in the left foot and 1+ swelling in the right foot. Dr. Di Valerio diagnosed idiopathic edema, recommended that Plaintiff keep his legs elevated (without specifying a length of time), and discussed the disability process with him. (Tr. at 115).

The next medical evidence in the record is from one year later -- the February 2, 2001 letter (referenced in footnote 3 above) from Dr. Di Valerio to Plaintiff's attorney summarizing visits from August to November 1999. In this letter, Dr. Di Valerio stated that it was his clinical opinion that Plaintiff was unable to perform his job with the Post Office, given his medical condition and his need to elevate his legs as much as possible. Dr. Di Valerio opined that Plaintiff "should be a good candidate for disability benefits" and asked for the attorney's help in the matter. Tr. at 123-24.

Dr. Di Valerio's treatment notes from May 17, 2001, state that Plaintiff complained of swelling in his right leg and shooting pains in his left foot, with increased swelling from prolonged sitting, standing, and walking. According to Dr. Di Valerio, Plaintiff claimed that his only relief came from elevating his legs. Dr. Di Valerio diagnosed profound edema in Plaintiff's left foot and ankle and slight edema in his right

foot and ankle.  Elevation of Plaintiff's legs was again recommended, and options for disability were discussed.  Tr. at 375.

On May 18, 2001, Dr. Di Valerio wrote a letter "To Whom It May Concern," stating that Plaintiff had been diagnosed with "idiopathic lower extremity edema and chronic venous stasis changes."  The letter notes that Plaintiff had consulted with two vascular surgeons who, along with Dr. Di Valerio, recommended that Plaintiff try to keep his legs elevated "at all times" to alleviate the swelling.  Dr. Di Valerio added that anti-inflammatory medications, Prednisone, and diuretics were unsuccessful in treating Plaintiff's symptoms.  Dr. Di Valerio stated that it was his "true and honest" opinion that Plaintiff could not perform his job at the Post Office or any other job where he could not keep his legs elevated at the workplace.  Tr. at 121-22.

**Evidentiary Hearing of June 20, 2001**

At the June 2001 hearing, Plaintiff (then 40 years old) testified that he was about 5' 10" and weighed 235 to 240 pounds, which was close to his normal weight.  He testified that he lived with his sister, had two years of college credit, and last worked in June 1999 when he left his job with the Post Office due to problems with swelling in his legs.  This job required him to be on his feet most of the time with some sit-down time.  Plaintiff testified that the doctors he saw for the swelling told him that he had a circulation problem for which there was essentially no treatment, and that surgery could result in more harm that help.  Plaintiff testified that he also experienced pain when sitting, not just when standing, and that his only relief was lying down.  Tr. at 17-20.

Plaintiff testified that he saw Dr. Di Valerio often at first, but did not see him

much anymore as he was told nothing could be done to help him.  He testified that his sister did most of the work around the house, that he went grocery shopping on rare occasion, that he mowed the yard a little using a rider mower, and that he would occasionally sit at his computer for half an hour to two hours at a time.  Plaintiff testified that he used to go hunting and swimming but had not done either of these things in a long time, and that since the problems with his feet began, he spent most of his time on the couch watching TV.  Tr. at 22-24.

## ALJ'S Decision of July 27, 2001, and Remand

By decision dated July 27, 2001, the ALJ concluded that Plaintiff was not disabled.  The ALJ did not give significant weight to Dr. Di Valerio's opinion of disability because, according to the ALJ, the medical record did not indicate that Plaintiff received continuous, ongoing treatment from Dr. Di Valerio.  The ALJ noted that Plaintiff did not include in the record notes from the May 17, 2001 visit to Dr. Di Valerio or reports from the two vascular surgeons whom Dr. Di Valerio mentioned had seen Plaintiff.  The ALJ found that Plaintiff's claim that he was advised that there was nothing his doctors could do for him was not supported by the medical evidence.  The ALJ believed Plaintiff to the extent that he could not do his past relevant job, but concluded that Plaintiff could perform the full range of sedentary work[7] and was therefore not disabled under the

---

[7]  "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

Guidelines, given his age, education, and work experience. Tr. at 10-12. The Appeals Council denied Plaintiff's request for review, and Plaintiff filed an action for judicial review on August 5, 2002.

As noted above, on January 3, 2003, the Commissioner filed a motion asking that the Court reverse the agency decision and remand the case for further proceedings. The Commissioner represented that upon remand, the ALJ would be instructed to recontact Dr. Di Valerio to ascertain why his treatment notes did not support his opinion that Plaintiff was disabled; attempt to obtain all medical evidence from the relevant time period, including records from the two vascular surgeons mentioned by Dr. Di Valerio; consider whether a consultative examination was warranted; reevaluate all medical source opinions of record; redetermine Plaintiff's RFC; and utilize the testimony of a vocational expert. The Commissioner stated that remand was requested so that the agency would have an opportunity to correct its own errors and to compile a record that was adequate for judicial review, if further judicial review was necessary following remand. Peasel v. Barnhart, No. 4:02CV1066 JCH, Doc. #14. On January 23, 2003, the Court granted the motion. Tr. at 189-90. Meanwhile, a hearing on Plaintiff's February 2002 application had been set for that same day, January 23, 2003.

**Evidentiary Hearing of January 23, 2003**

At the start of the January 23, 2003 hearing, Petitioner's counsel brought the Court's remand Order to the ALJ's attention.[8] The ALJ asked if the record now included

_____

Social Security Ruling (SSR) 96-9p, 1996 WL 374185, at *6-7 (July 2, 1996).

[8]     See footnote 1 above.

the reports from the two vascular surgeons referenced in the Order. Plaintiff's attorney responded that the last medical evidence in the record was Dr. Di Valerio's February 15, 2002 treatment notes. The ALJ asked Plaintiff's attorney if he knew who the two surgeons were, and counsel responded as follows: "I can assume that they were part of the record in the prior case, but [Plaintiff] informs me that he has not seen any vascular surgeon or Dr. Di Valerio since last February." Tr. at 154.

Plaintiff then proceeded to testify. He again testified that he had worked up until June 1999 when he began experiencing problems with his legs -- severe swelling, pain, and tingling going up his legs. Plaintiff testified that he consulted with Dr. DiValerio, and that after a venogram was conducted, the doctor told him that he was born with certain "parts" and that there was nothing to be done about it. (Tr. at 155-57).

Plaintiff testified that the pain and swelling in his legs kept him from doing his work, since his job entailed standing on his legs all day. He testified that the doctors tried to control the situation with blood thinners and drugs, but were unsuccessful. Plaintiff testified that he also developed ulcers on his legs below his knees, and that he did not think there was a way to treat the ulcers and so did not do anything about them. He testified that the problems with his legs had not changed in the past four years, and that he was told that he would have this condition for the rest of his life. He testified that when his legs started to hurt, he would lie down or rest, which could be a big part of the day, and that this had been ongoing since he stopped working. Tr. at 157-59.

Plaintiff then testified about a recent sleep study he had undergone at Barnes Hospital. He participated in this procedure because he would fall asleep during the day in

the middle of conversations and snored loudly. Plaintiff testified that he was told he had severe apnea and that his oxygen levels were low, and that he was advised to use a CPAP (Continuous Positive Airway Pressure) machine at night. Plaintiff testified that he was still not sleeping through the night and was having problems with the CPAP machine. He was supposed to see the doctor again. Tr. at 159-62.

Plaintiff stated that he spent his time watching TV. He did vegetable gardening with his friends in the summer and had no other hobbies. He testified that his brother drove him to the hearing, as Plaintiff did not like to drive much himself. Plaintiff testified that he was on private disability from the Postal Service. He testified that he used a computer rarely, maybe once or twice a week, basically to look up information for his company. He testified that he cut his grass on a riding mower and did his own household chores (cooking, cleaning, laundry, grocery shopping). Plaintiff did not participate in any church activities or belong to any organized clubs or groups. Tr. at 162-65.

Plaintiff testified that his phone card business was basically "depleted," with his sister taking care of the minimal business that remained. A company would order phone cards from Plaintiff, and his sister would deliver the cards. Plaintiff stated that he did not earn much from the business, with no cards having been sold or ordered in the month preceding the hearing. At most ten cards were sold a week. Plaintiff received about 37 percent of the cost of the $5, $10, or $20 cards. Tr. at 163-64.

## New Medical Evidence

As noted above, on May 15, 2003, the Appeals Council officially remanded the present case to the ALJ in accordance with the January 23, 2003 Order of the Court. Tr.

at 184.  Pursuant to the ALJ's instructions, Dr. Di Valerio was contacted on January 9, 2004, and was asked for all medical records pertaining to Plaintiff from January 1, 2002 onward.  Tr. at 229-30.  The only evidence submitted by Dr. Di Valerio in response was his treatment notes from February 28, 2002.  These notes state that Plaintiff still had swelling in his left foot and leg which increased with walking or standing.  Tr. at 234.

The record was also supplemented at some point with a hospital report dated November 19, 2002, regarding Plaintiff's self-referral for a sleep apnea evaluation.  The sleep study showed that Plaintiff had severe obstructive sleep apnea with severe oxygen desaturation.  He was advised to use a CPAP machine nightly, reduce his weight, and avoid alcohol.  The report noted that if compliance with the CPAP regimen was poor, surgery on the upper airways might be considered.  Tr. at 362-63.

The most recent medical evidence in the record at the time of the evidentiary hearing of September 30, 2003, was a report dated June 6, 2003, documenting Plaintiff's visit to the emergency room that day complaining of a gradual onset over the past month of pain in his right shin, foot, and ankle.  The report noted that Plaintiff's right foot and ankle showed redness and swelling, and that Plaintiff rated the pain he experienced since the previous day as 10 (presumably on a scale of 1-10) when standing and "0/10" when the leg was elevated.  Plaintiff was diagnosed with acute leg pain and chronic venous stasis.  He was prescribed pain medication and was discharged to follow up with Dr. Di Valerio.  Tr. at 248-51.

**Evidentiary Hearing of September 30, 2003**

Plaintiff testified at this hearing that he could no longer work because of

problems with his (left) leg swelling and with difficulties sleeping. The swelling would occur at different unpredictable times during the week. The only thing he could do to ease the swelling was to keep the leg elevated. Tr. at 173-75. Plaintiff testified that due to sleep apnea he was unable to concentrate or think and was extremely tired and irritable. He testified that he was having trouble using the breathing device he had been given to help him sleep. He would be up most of the night, sometimes able to sleep for two or three hours with the device. Tr. at 176, 179. Plaintiff was on no medications other than aspirin. He drove, using his right leg. Plaintiff testified that he was not keeping up with basic household chores, and that his house was a "wreck." He testified that he sometimes felt depressed and rarely went out, and that the last time he did "anything," including grocery shopping, was about a month ago. He also had not gone to church in about a month or two. Tr. at 177-79. The ALJ again inquired about Plaintiff's phone card business. Plaintiff testified that for the last year or two he essentially did nothing related to this business. Tr. at 179-81.

**More New Evidence**

On January 5, 2005, Plaintiff submitted medical records related to a fractured toe that he had sustained in early September 2003. A report dated September 2, 2003, reviews Plaintiff's visit to the emergency room with a fractured little left toe, which Plaintiff claimed he had stubbed one hour earlier at home. Physical examination revealed several superficial lower extremity lesions besides the fractured toe, but no calf tenderness or "cyanosis/clubbing/edema." Plaintiff's wound was cleaned, a splint was put on his foot, he was prescribed an antibiotic and pain medication, and was discharged.

Tr. at 242-47.

Notes from a follow-up visit the next day with a doctor of osteopathy state that Plaintiff did not recall how he had hurt his toe. Tr. at 239. A short note from this doctor dated September 11, 2003, states as follows:

> Mr. Peasel is follow up for laceration and fracture of his toe. He says he missed a couple of days of his antibiotics and he says he's on it a lot. Says he hurt it playing soccer but the shoe was really grossly dirty. A little swelling not awful. No active drainage. We're going to put him on a once a day antibiotics and hopefully he'll take it.

Tr. at 238. At a follow-up appointment on September 16, 2003, Plaintiff reported that his toe hurt sometimes. His wound looked normal, and the antibiotic was discontinued. Tr. at 239. Plaintiff missed a follow-up appointment on November 25, 2003, and notes from his appointment on October 10, 2003, state that his wound and fracture were healed. Tr. at 237. In the letter submitting the above records, Plaintiff's attorney stated, "This now completes the evidence Claimant wishes to submit at this time." Tr. at 235.

**ALJ's Decision of March 23, 2004**

The ALJ issued two separate, virtually identical decisions on March 23, 2004 -- one related to the present case based upon Plaintiff's November 2000 applications and one related to his February 2002 application. The one contained in the main administrative record before the Court relates to the latter application. Tr. at 138-50. Plaintiff did not seek the review of the Appeals Council as to this decision, and the decision is not before the Court. The second decision appears in a supplement filed by Plaintiff to the administrative record (Doc. #14). It is this decision which is the subject matter of the present action.

In this decision, the ALJ first noted that he reevaluated all the medical source opinions as directed on remand, but that a vocational expert was not utilized because Plaintiff was found to have solely exertional limitations, obviating the need for vocational expert testimony. The ALJ stated that he attempted to obtain additional information from Dr. Di Valerio with regard to any treatment since January 2002, and only the treatment notes dated February 28, 2002 were returned from Dr. Di Valerio. Supp. Tr. at 2.

The ALJ then considered whether Plaintiff's phone card business constituted substantial gainful activity. The ALJ took administrative notice of the fact that Missouri State public records established that Plaintiff's company was still "active" as of February 2004. The ALJ interpreted Plaintiff's testimony at the September 2003 hearing that he had not done anything in the business for the last two years as indicting that Plaintiff's participation prior to September 2001 or September 2002 was "fairly active, at least as active as such a business venture requires (removing cash from vending machines and filling such machines with new cards)." Supp. Tr. at 3. The ALJ also pointed to tax records indicating that Plaintiff's gross receipts from this business for 1999 and 2000 were over $80,000 and over $35,000, respectively. The ALJ believed that this "strongly" suggested substantial gainful activity through "at least September 2000 or 2001." Supp. Tr. at 4. Assuming, however, that this was not "absolutely confirmed," the ALJ proceeded to consider the medical record and Plaintiff's testimony to determine whether Plaintiff was disabled.

The ALJ found that Plaintiff had a history of idiopathic edema of the legs, vascular insufficiency, sleep apnea, and a fractured toe, but that these impairments did not

meet or medically equal an impairment listed in Appendix 1.  The ALJ concluded that although at the September 2003 hearing Plaintiff reported depression related to his impairments, the record failed to establish this as a severe impairment.  The ALJ noted that Plaintiff did not allege depression in his applications for benefits and in his testimony he acknowledged that he had had no mental health treatment.  The ALJ also concluded that Plaintiff's fractured toe, sleep apnea, weight, and back pain were not severe impairments.  Supp. Tr. at 4-6.

Upon review of the medical evidence related to Plaintiff's edema and vascular insufficiency, the ALJ decided to accord very little weight to Dr. Di Valerio's opinions of disability expressed in the letters of February 8, 2001, May 18, 2001, October 8, 2001, and February 15, 2002, even though Dr. Di Valerio was Plaintiff's treating physician. The ALJ first noted that these opinions concerned a matter reserved for the ALJ, namely, whether a claimant was disabled or not.  Further, the ALJ did not believe that the length of time Dr. Di Valerio treated Plaintiff was consistent with allegations of ongoing and severe symptoms, especially symptoms lasting 12 consecutive months.  Supp. Tr. at 7.

The ALJ noted that Plaintiff only sought treatment from Dr. Di Valerio for about six months, from August 1999 through February 2000.  Thereafter, there was no treatment until February 2002, except in February 2001 and May 2001, with the timing of these two visits indicating that they were for the purpose of litigation rather than for ongoing complaints.  After February 28, 2002, the only documented treatment Plaintiff sought for swelling and pain in his feet and ankles was in June 2003.  The ALJ noted that although Dr. Di Valerio reported that Plaintiff's swelling was not responsive to treatment,

the record included later findings of no swelling as noted earlier in the ALJ's decision. Also, the emergency room treatment sought in June 2003, "for a short period of swelling," indicated to the ALJ that Plaintiff thought he could benefit from treatment and that his condition had previously resolved. Supp. Tr. at 7-8.

The ALJ also noted that the record did not reflect ongoing use of prescribed pain medication. The ALJ believed that this undermined both the credibility of Plaintiff's allegations of ongoing and severe pain and of Dr. Di Valerio's above-mentioned letters. The ALJ stated that the four letters appeared to be based upon Plaintiff's own complaints rather than on long-term treatment records. Supp. Tr. at 7-8.

The ALJ found it "very significant to note" that this Court's January 23, 2003 Order "included the finding that Dr. Di Valerio's treatment notes do not support his opinion that the claimant is disabled." Supp. Tr. at 8-9. The ALJ again stated that Dr. Di Valerio's opinion that Plaintiff was disabled was inconsistent with subsequent medical records. The ALJ pointed to the finding of "no edema" in Plaintiff's extremities in connection with his September 2002 evaluation for apnea, the notation of "no edema" when Plaintiff sought treatment for his fractured toe in September 2003, and the related September 2003 notation that Plaintiff reported he was on his left foot a lot and fractured his toe while playing soccer.[9] Supp. Tr. at 9. The ALJ saw no need to recontact Dr. Di Valerio once again, noting that Plaintiff's attorney indicated that no further evidence was forthcoming from Dr. Di Valerio. Supp. Tr. at 9-10.

---

[9] It is not entirely clear to the Court from the notation referred to by the ALJ, quoted above at page 15, whether Plaintiff said he was on his left foot a lot or on his antibiotic a lot.

18

The ALJ again found that the lack of documentation of ongoing medical treatment indicated that Plaintiff was frequently without prescribed pain medication, which was inconsistent with Plaintiff's subjective complaints of disabling pain. The ALJ saw no evidence in the record that Plaintiff could not afford pain medication or that he experienced bad side effects due to prescribed medications. The ALJ stated that the medical records "repeatedly established" that Plaintiff's symptoms were controllable. Supp. Tr. at 10.

The ALJ recognized Plaintiff's strong earnings record, but cited several countervailing factors as inconsistent with Plaintiff's allegations of disability: there was no evidence that Plaintiff needed an assistive device to get around or that he had significant atrophy or loss of muscle tone; he was never fired from any work activity due to inability to perform the duties of the job; and he used a computer, washed dishes and clothes, went grocery shopping, cut grass on a rider mower, gardened, and played soccer. The ALJ concluded that Plaintiff's impairments precluded, at most, lifting more than ten pounds on a regular basis and standing and/or walking more than two to four hours in a regular eight hour workday. According to the ALJ, the record did not support a finding that Plaintiff needed to elevate his legs "constantly, frequently, or even infrequently." The ALJ further found that Plaintiff could perform prolonged sitting. Supp. Tr. at 10-11.

The ALJ found that Plaintiff could not perform his past relevant work, but that in light of Plaintiff's age, education, work experience, and RFC, Plaintiff was not disabled pursuant to the Guidelines for sedentary work (20 C.F.R. Part 404, Subpart P, Appendix 2, Table No. 1, Rules 201.27 through 201.29). Supp. Tr. at 12.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of disability benefits, the Court must affirm the findings of an ALJ that are supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g);[10] Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003); Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998). Substantial evidence is less than a preponderance, but enough that a reasonable person would find is adequate to support the conclusion. Edwards, 314 F.3d at 966; Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The Court may not make its own findings of fact or substitute its own judgment for that of the Commissioner. Lochner v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992). When the Court reviews the record for substantial evidence, it must review the entire record and consider whatever detracts from the weight of the evidence invoked by the ALJ. O'Donnell v. Barnhart, 318 F.3d 811, 816 (8th Cir. 2003); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 1998). Reversal, however, is not proper merely because there is evidence that might support an opposite result. Boyd v. Sullivan, 960 F.2d 733, 736 (8th Cir. 1992).

To be entitled to Social Security disability benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity by reason of a medically determinable impairment which has lasted or can be expected to last not less than 12 months. 42 U.S.C. § 423(d)(1)(A); Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both the impairment and the inability to engage in substantial gainful employment must

---

[10] As is the general convention, citations in this Report and Recommendation to statutory and regulatory provisions are to those appearing under the Social Security Administration's program for disability insurance benefits rather than for SSI benefits. The relevant provisions are identical under each program.

last or be expected to last not less than 12 months).  To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If so, disability benefits are denied.  If not, the Commissioner decides whether the claimant has a "severe" impairment (or combination of impairments), defined in 20 C.F.R. § 404.1520(c) as an impairment which significantly limits a claimant's physical or mental ability to do basic work activities.  If the claimant's impairment is not severe, the disability claim is denied.  If the impairment is severe, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in Appendix 1.

If the claimant's impairment meets or equals a listed impairment, the claimant is conclusively presumed to be disabled.  If the impairment is one that does not meet or equal a listed impairment, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work.  If the claimant is able to perform his past relevant work, he is not disabled.  If he cannot perform his past relevant work, step five asks whether the claimant has the RFC to perform work in the national economy in view of his vocational factors, i.e., his age, education, and work experience.  If not, the claimant is declared disabled and is entitled to disability benefits.   20 C.F.R. §§ 404.1520(a)-(f); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).

At step five, the burden is upon the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national

economy that are consistent with the claimant's impairments and with his vocational factors.  Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  Where a claimant cannot perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Guidelines due to nonexertional impairments, such as pain, the ALJ cannot carry this burden by relying exclusively on the Guidelines, but must consider testimony by a  vocational expert.  Id.; Wilcutts v. Apfel, 143 F.3d 1134, 1137 (8th Cir. 1998).

Here, the ALJ concluded at step three that plaintiff did not have an impairment that met or equaled a listed impairment.  The ALJ then concluded at step four that plaintiff was unable to perform his past relevant work.  At step five the ALJ concluded, based upon the Guidelines, that plaintiff was capable of performing sedentary work and was thus, not disabled.

## Discounting the Opinion of Plaintiff's Treating Physician

Plaintiff first argues that the ALJ committed reversible error in discounting the opinion of Dr. Di Valerio that Plaintiff was disabled.  In evaluating medical opinion evidence, the ALJ is to consider the nature and extent of the examining/treatment relationship, the supportability of the opinion, the consistency of the opinion with the rest of the record, and the specialization of the medical source.  20 C.F.R. § 404.1527(d).  An ALJ is to give controlling weight to a treating source's opinion if it is well-supported by medically acceptable clinical laboratory diagnostic techniques and not inconsistent with other substantial evidence.  Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005).  A treating physician's opinion, however, does not automatically control, since the record

must be evaluated as a whole, and the ALJ may discount or even disregard the opinion of a treating physician where other medical assessments "are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Reed v. Barnhart, 399 F.3d 917, 920-921 (8th Cir. 2005) (citation omitted).

Here, the Court notes that Dr. Di Valerio did not quite opine that Plaintiff was disabled in the sense that Plaintiff could not engage in substantial gainful activity. Rather Dr. Di Valerio opined that firstly, Plaintiff could not perform his job as a postal worker, and secondly, that Plaintiff could not work at a job that did not allow him to keep his feet elevated. The ALJ accepted the first aspect of Dr. Di Valerio's opinion. This leaves the question of whether the ALJ could discount, as he did, the second aspect of Dr. Di Valerio's opinion.

The opinion that Plaintiff needed to keep his feet elevated is a medical opinion, not a matter reserved for the ALJ. And so the ALJ's first reason for discounting Dr. Di Valerio's opinion that Plaintiff needed to keep his feet elevated during the workday is misguided. Further, the Court takes exception to the ALJ's characterization of the Court's January 23, 2003 Order granting the Commissioner's motion to remand. The Order in no way constituted a finding by the Court that Dr. Di Valerio's opinion on this matter was not supported by his treatment notes.

The ALJ, however, relied upon other reasons in discounting Dr. Valerio's opinion that Plaintiff needed to keep his feet elevated during the workday, at least to the extent that this restriction mandated a finding that Plaintiff could not perform even

sedentary work.  As noted above, to be entitled to Social Security disability benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity for not less than 12 months, by reason of a medically determinable impairment which has lasted or can be expected to last not less than 12 months.  42 U.S.C. § 423(d)(1)(A); Barnhart, 535 U.S. at 217-22.

Here, as the ALJ noted, after the initial six-month period of treatment by Dr. Di Valerio, there are significant gaps in Plaintiff's treatment record.   In addition, again as the ALJ noted, the record does not contain any treatment notes from February 2000 until February of the next year.  And after February 2002, the only documented treatment was in June 2003, at which time Plaintiff complained of a gradual onset of swelling in his feet over the past month.  Furthermore, medical records from September 2002 and again from September 2003 indicate that there was no current edema.  The fact that Plaintiff was playing soccer in September 2003 certainly lends support to the ALJ's decision to discount Dr. Di Valerio's opinion that Plaintiff was disabled.

**ALJ's RFC Assessment**

Plaintiff argues that the ALJ erred in assessing an exertional RFC that was not based on any medical evidence.  A disability claimant's RFC "is the most he can still do despite his limitations."  20 C.F.R. § 404.1545(a)(1).  In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as "the ability to do the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."  Id. at 1147; see also Forehand v. Barnhart, 364 F.3d 984, 988 (8th Cir. 2004).  The ALJ's determination of an individual's

RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3rd 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, "the ALJ bears the primary responsibility for determining a claimant's" RFC. Id. at 1023. An RFC is to be based upon all the evidence, but it remains a medical question; thus, "[s]ome medical evidence is necessary to support the ALJ's determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (internal quotations omitted); Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000) (an ALJ "may not draw upon his own inferences from medical reports").

Here, there is no medical evidence, such as the opinion of a consulting physician or the testimony of a medical expert, to support the ALJ's determination that Plaintiff could perform the full range of sedentary work. Indeed, although the ALJ was not directly ordered to obtain such evidence on remand, the remand strongly suggested that if Dr. Di Valerio's opinion was to be discredited, the opinion of a consulting medical source should be obtained. The Court notes that an ALJ has the duty to develop the record fully and fairly "independent of the claimant's burden to press his case," even if the claimant is represented by counsel. Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004). Accordingly, this case should be remanded once again for this purpose. See, e.g., Ford v.

Secretary of HHS, 662 F. Supp. 954, 956 (W.D. Ark. 1987) (case remanded where ALJ's determination that plaintiff had the RFC to perform sedentary work was not supported by some medical evidence establishing how plaintiff's past heart attacks affected his RFC), cited with approval in Nevland, 204 F.3d at 858.

**Evaluation of Plaintiff's Credibility**

Plaintiff argues that the ALJ improperly discredited Plaintiff's subjective complaints of pain. Specifically, Plaintiff argues that his ability to perform sporadic light activities does not mean that he is able to perform full-time competitive work. In Polaski, the Eighth Circuit held that the "absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints." 739 F.2d at 1322. The Court explained that in evaluating a claimant's subjective complaints of pain, an ALJ must also consider "observations by third parties and treating and examining physicians relating to such matters as (1) the claimant's daily activities; (2) the frequency, duration, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions." Id.

After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record that caused him to reject the plaintiff's complaints. Baker v. Apfel, 159 F.3d 1140, 1144 (8th Cir. 1998). "The decision of an ALJ who seriously considered, but for good cause expressly discredits a claimant's subjective complaints . . . is not to be disturbed." Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999). "If the ALJ discredits a claimant's credibility and gives a good

reason for doing so, [the court] will defer to [his] judgment even if every factor is not discussed in depth." Donahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In many disability cases, there is no doubt that the plaintiff is experiencing pain; "the real issue is how severe that pain is." Sampson v. Apfel, 165 F.3d 616, 619 (8th Cir. 1999).

Here, as the ALJ recognized, Plaintiff's strong work record supported Plaintiff's credibility. See, e.g., Curran-Kicksey v. Barnhart, 315 F.3d 964, 970 (8th Cir. 2003). But the ALJ believed that Plaintiff's testimony about his daily activities belied Plaintiff's allegations of disabling pain. Indeed, the Eighth Circuit has held in various contexts that daily activities of driving, cooking, and washing dishes were inconsistent with claims of disabling pain. See, e.g., Walker v. Shalala, 993 F.2d 630, 631-32 (8th Cir. 1993). On the other hand, the Eighth Circuit has explained that the ability to engage in some life activities does not always support a finding that a claimant retains the ability to work "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Forehand v. Barnhart, 364 F.3d 984, 988 (8th Cir. 2004).

Here, several reasons given by the ALJ for discrediting Plaintiff's allegations of disabling pain -- in part, the same reasons that supported the ALJ's discounting Dr. Di Valerio's opinion -- are valid and supported by the record, especially Plaintiff's failure to take prescription pain medication. See, e.g., Masterson v. Barnhart, 363 F.3d 731, 739 (8th Cir. 2004) (in discrediting extent of pain alleged by plaintiff, ALJ properly considered plaintiff's failure to take any narcotic medication for pain but was rather only taking nonsteroidal anti-inflammatory drugs). The infrequency with which plaintiff sought medical treatment after September 2000 also undermines the credibility of his

allegations of disabling symptoms.  See Ostronski v. Chater, 94 F.3d 413, 419 (8th Cir. 1996) ("[plaintiff's] failure to seek medical treatment between July 1986 and September 1988, and infrequent medical treatment from September 1988 to June 1992, suggest that the severity of her pain [in January 1993] is not so great as to preclude her from performing light work.").  The Court notes that Plaintiff's treatment record might be explained by the fact that not much could be done for his condition.  This is another matter a consulting physician or medical expert could clarify.

**Reliance upon the Guidelines**

At the time of the ALJ's decision, Plaintiff was approximately 42½ years old or, in terms of the relevant regulations, 20 C.F.R. § 404.1563(c), a younger individual.  Under the Guidelines, such an individual who retained the RFC to perform sedentary work is deemed not disabled, even if he has no transferable skills.  See 20 C.F.R. Part 404, Subpt. P, App. 2, Table No. 2, Rule 202.27 - 202.29.

Plaintiff argues that the ALJ erred in relying on The Guidelines to find that Plaintiff was not disabled.  Specifically, Plaintiff asserts that his need to elevate his legs at least occasionally during the workday constitutes a nonexertional impairment that necessitated the testimony of a VE.  As noted above, the Appeals Counsel directed the ALJ to obtain the testimony of a VE upon remand of the case, and upon further remand, depending on the nature of the medical evidence obtained, such vocational testimony may be necessary.

## CONCLUSION

The ALJ's decision is not supported by substantial evidence on the record as a

whole.  The case should be remanded to the Commissioner to further develop the record in order to obtain appropriate medical evidence to support a proper RFC assessment.  The ALJ can then determine whether there are jobs in the national economy that Plaintiff can perform.  In making such a determination, the ALJ may well need to obtain the testimony of a vocational expert.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be **REVERSED** and **REMANDED** for further proceedings consistent with this Report and Recommendation.

The parties are advised they have ten days to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.


AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 10th day of August, 2005.